# In the United States Court of Federal Claims

No. 24-2035
(Filed Under Seal: May 29, 2025)
(Reissued: June 18, 2025)[*]
**FOR PUBLICATION**

***************************************
| | |
|---|---|
| RED RIVER SCIENCE & TECHNOLOGY, LLC, | * * * |
| Plaintiff, | * * |
| v. | * * |
| THE UNITED STATES, | * * |
| Defendant, | * * |
| and | * * |
| GEMINI TECH SERVICES LLC, | * * |
| Defendant-Intervenor, | * * |
| and | * * |
| VANQUISH WORLDWIDE, LLC, | * * |
| Defendant-Intervenor. | * * |

***************************************

*Jackson W. Moore, Jr.*, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., Raleigh, N.C., for Plaintiff. With him on the briefs was *Amelia L. Serrat*, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., Raleigh, N.C.

*Evan Wisser*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With him on the briefs were *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Corinne A. Niosi*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well as *John C. Degnan*, Senior Trial Attorney, Team I, and *Maj. Danielle C. Naser*, Trial Attorney, Contract Litigation & Intellectual Property Division, U.S. Army Legal Services Agency.

*Matthew T. Schoonover*, Schoonover & Moriarty LLC, Olathe, KS, for Defendant-Intervenor, Gemini Tech Services LLC. With him on the briefs were *Ian P. Patterson*, *Timothy J. Laughlin*, and *Haley M. Sirokman*, Schoonover & Moriarty LLC, Olathe, KS.

*Michael D. Maloney*, Williams Mullen, PC, Tysons, VA, for Defendant-Intervenor Vanquish Worldwide, LLC. With him on the brief was *Anthony H. Anikeeff*, Williams Mullen, PC, Tysons, VA.

## OPINION AND ORDER

Red River Science and Technology, LLC ("Red River") submitted a proposal to a solicitation issued by the Army under the Enhanced Army Global Logistics Enterprise ("EAGLE") Program. Over the course of the procurement, Red River lost "apparent awardee" status on two occasions. Plaintiff then filed this pre-award protest objecting to various aspects of the Army's management of the procurement. *See* Compl. (ECF 1). Gemini Tech Services LLC ("Gemini") and Vanquish Worldwide, LLC ("Vanquish"), the other offerors in the competitive range, intervened over Plaintiff's objection. *Red River Sci. & Tech., LLC v. United States*, 174 Fed. Cl. 431, 433 (2025). Red River moved for judgment on the administrative record, the government and Gemini have filed cross-motions, and I have heard oral argument.[1]

For the reasons discussed below, Plaintiff's motion is **DENIED** and Defendant's and Gemini's motions are **GRANTED**. Red River filed a motion for leave to file new authority (ECF 58), which is **GRANTED**. The case is **DISMISSED**.

## BACKGROUND

### I. The Solicitation

The EAGLE program is a basic ordering agreement governed by Federal Acquisition Regulation ("FAR") § 16.703 (codified at 48 C.F.R. § 16.703); *see also* Def.'s MJAR at 3. The Army issued Solicitation No. W519TC-23-R-0022 — seeking

---

[*] Pursuant to the protective order in this case, the Court initially filed this opinion under seal on May 29, 2025, for the parties to propose redactions of confidential or proprietary information. The parties were directed to propose redactions by June 12, 2025. Plaintiff submitted proposed redactions and supporting memorandum. The Defendant has advised that the Government takes no position on the proposed redactions. No proposed redactions were received from the Defendant-Intervenors. The Court proposed an additional redaction, which Plaintiff has approved. As stated above, the Defendant has advised that the Government takes no position on the additional proposed redaction. The Court did not receive a response from the Defendant-Intervenors as to their position regarding the additional proposed redaction. The Court has incorporated all redactions, and makes them with bracketed ellipses ("[. . .]" below.

[1] Pl.'s MJAR (ECF 40); Gemini's MJAR (ECF 42); Vanquish's Resp. (ECF 43); Def.'s MJAR (ECF 44); Pl.'s Reply (ECF 48); Def.'s Reply (ECF 49); Gemini's Reply (ECF 50); Oral Arg. Tr. ("Tr.") (ECF 57).

logistics support for services at Fort Campbell, Kentucky — as an order under the EAGLE program. AR 151; *see* FAR § 16.703(d).

The Solicitation provided that source selection would consist of an initial compliance review followed by a three-step evaluation: Step One — Technical Evaluation, Step Two — Past Performance and Cost/Price Evaluations, and Step Three — Award.[2] AR 151, 195; Pl.'s MJAR at 3. Step Two is the only stage of the analysis at issue in this case.

The Cost/Price component of Step Two called for the Army to evaluate "price reasonableness and cost realism." AR 196. That determination included review of offerors' "indirect rates." AR 199. Indirect rates include contractor costs for overhead expenses and other administrative costs, such as insurance, office leases, and the like that are not billed as labor costs under the contract. AR 192 ¶ L.5.4.2.13(a) ("Indirect rates allocate indirect costs such as overhead, general & administrative (G&A) expense, and fringe benefit costs."); Tr. at 12–13, 68.

As originally issued, the Solicitation warned that offerors must "fully support[]" their estimated indirect expense rates or else face a cap on their rates "for the life of the requirements task order." AR 199. Offerors were directed to propose their aggregated indirect costs in terms of a rate or percentage on top of the direct costs of performance. Tr. at 68; *see* AR 192. Proposed indirect rates that were not "fully supported" by "a detailed explanation" satisfactory to the Army would be "capped" at a rate that the Army itself determined based on the historical costs for the duration of the contract. AR 192, 199; Tr. at 68–69; *see* AR 959; *see also* FAR § 42.703-2(c)(2)(i). A successful offeror that did not fully support its indirect rates would be required to perform at rates based on historical figures. Tr. at 69–70; Def.'s MJAR at 4 (citing AR 7972).

The original version of the Solicitation thus provided offerors a choice: fully support indirect rates, or accept the historical cap determined by the Army. *See* AR 199 ¶ M.5.3.3(a) ("By submitting a proposal for this task order, the Offeror and Subcontractor(s) understand and accept that the Government will cap any indirect expense rates not fully supported at the proposed rates."). The Solicitation emphasized that offerors would not be allowed to question that choice, warning that "an Offeror or Subcontractor that takes exception to this requirement will be deemed unacceptable and will not be further considered for award." AR 199 ¶ M.5.3.3(a); *see also* AR 193 ¶ L.5.4.2.13(h) ("COMPLIANCE REQUIREMENT: Failure of the Offeror, or its proposed Subcontractors to provide its Indirect Expense rate data and

---

[2] The Army "reserve[d] the right to simultaneously evaluate Technical, Past Performance … , and Cost/Price proposals." AR 195.

in compliance with L.5.4.2.13(d) shall render the Offeror's proposal non-compliant. The proposal will not be evaluated and will not be further considered for award.").

The Solicitation provided that the Army would award the order to the offeror "whose proposal complies with the RFP [Request for Proposal] requirements and is determined to be the lowest total evaluated priced proposal that is determined to be Technically Acceptable with Substantial Confidence in Past Performance with a fair and reasonable Total Evaluated Price." AR 195. The Solicitation stated that the Army intended to award without discussions, while reserving the right to conduct discussions if deemed necessary. AR 177 ¶ L.1.2 ("The Government reserves the right to conduct discussions in the evaluation process and to permit Offerors to revise proposals, if deemed necessary."); AR 194 ¶ M.2 ("The Government reserves the right to: ... conduct discussions at any stage of the evaluation process[.]"); *see also* AR 195–96.

## II. History of the Procurement

Three offerors — Red River, Vanquish, and Gemini — reached Step Two. *See* AR 3065, 6824, 6839. In November 2023, the Army named Red River the first "apparent awardee." *See* AR 7540.

Gemini protested at the Government Accountability Office ("GAO"), AR 3150–56, eventually arguing that in accordance with Defense Federal Acquisition Regulation Supplement ("DFARS") § 215.306, the Army should have "engaged in discussions, or documented a basis for withholding discussions." AR 3953–54. The Army then announced a corrective action, staying the award and opening discussions with all offerors. AR 3957. The Army explained that in light of Gemini's "supplemental protest allegation" about DFARS § 215.306, the Army had determined that its "acquisition file lacks rationale for not opening discussions." AR 3965–66. Red River objected to the Army's notice of intent to take corrective action, AR 3959, but the GAO dismissed Gemini's protest. AR 3964.[3]

Two months later — in April 2024, when discussions were in progress — Red River requested that the Army produce the November 2023 Source Selection Decision Document ("SSDD") concerning the initial award notice to Red River. AR 7683. The Army declined to produce the SSDD, explaining that Red River's request "was a matter to be taken up at the time of original debriefings." AR 7683.

Following discussions, the Army identified a competitive range of three offerors: Red River, Vanquish, and Gemini. AR 5308, 5311. All three offerors received

---

[3] Red River filed its own GAO protest challenging the Army's decision to take corrective action and open discussions, AR 3983–97, but it ultimately withdrew that protest, AR 4266.

evaluation notices, and each was asked to provide additional information about its indirect rates. *See* AR 5318–20, 5324 (Gemini and its subcontractor), 5335–41 (Red River and its subcontractor), 5345–47 (Vanquish). The Army's subsequent cost realism analysis stated that Red River's indirect rates were [. . .]. In contrast, the Army found that Vanquish's indirect rates were not fully supported and recommended a cap. AR 6806. Gemini made a business decision to offer to cap its own rates, AR 6761, leading the Army to determine that its costs were "realistic." AR 6768; *see also* AR 5485–86.

After reviewing a final set of proposal revisions, in July 2024 the Army selected Vanquish as the apparent awardee. AR 6842. The Army notified Red River of that decision on July 10, 2024, and provided a document labeled as an SSDD Addendum. AR 6827; *see also* AR 6830–41. Red River again requested the original SSDD on July 11, and the Army re-sent its earlier refusal. AR 7821, 7859. But although Red River did not have the original SSDD for comparison, the SSDD Addendum included the technical analysis from the Army's prior evaluation. *Compare* AR 6838 (SSDD Addendum) *with* AR 3074 (SSDD); *see* Def.'s MJAR at 15. The price analysis in the original SSDD included [. . .].

Though selected for award, Vanquish voiced concerns about the cap on its indirect costs. AR 6920. The Army responded that "[a]ny refusal of the apparent awardee to accept the award will deem that offeror's proposal unacceptable and will no longer be awardable." AR 6915. Vanquish confirmed that "[a]s the Government's position remains to doubt our indirect fringe rates being supported and capping them along with all other indirect rates ... Vanquish will be unable to sign the contract." AR 6913. The Army acknowledged this response, reciting that "Vanquish Worldwide is no longer considered for award of the EAGLE Ft. Campbell contract." AR 6902.

The Army then selected Red River as the apparent awardee — its third award decision, and its second to Red River. AR 6923, 7535.

Before executing the order to Red River, however, the Army decided to reopen discussions. In August 2024, it notified all three offerors in the competitive range, and sent Vanquish and Gemini evaluation notices requesting further support of their indirect rates. AR 8352–57. The Army informed Red River — which had supported its indirect rates, AR 6780 — that its proposal did "not require Evaluation Notices." AR 8355. No mention was made of [. . .]. *Id.*

Red River sent questions regarding the discussions on August 16, 2024. AR 8366, 8372. When the Army did not respond, Red River followed up on August 22, the deadline to close discussions, *see* AR 8355, 8365, 8370–71, and sent additional

questions on August 26, *see* AR 8370. On both occasions the Army replied that answers would be forthcoming. *See* AR 8369–70.

On September 4, 2024, the Army sent "Attachment 0043–Responses to Questions" to the three remaining offerors. *See* AR 8285, 8289, 8159. Red River and Gemini also received an attachment containing answers to their specific questions. AR 8159 (labeling one attachment as the "Government responses to RRST's specific questions"); AR 8289 (labeling one attachment as the "Government responses to Gemini's specific questions").

After discussions closed, the Army issued Amendment 6 to the Solicitation, AR 8393–8400. Amendment 6 deleted the provisions that required offerors to fully support their proposed indirect rates or to accept a cap on the rates. AR 8394–95, 8398–99. In addition, Amendment 6 added a provision that forbade offerors from applying a self-imposed cap or discount on their indirect rates, eliminating a prior exception that would allow offerors to apply a cap in lieu of fully supporting their indirect rates. AR 8398. Otherwise, the requirement to fully support indirect rates remained in place. AR 8397. Red River filed a GAO protest objecting to the discussions and the issuance of Amendment 6, which the GAO denied. AR 8345–51. Red River then filed its complaint in this Court.

## DISCUSSION

### I. Legal Standards

#### A. Jurisdiction

To reach the merits of the case, I must first determine that the Court has jurisdiction over Red River's claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). This Court's jurisdiction in bid protests rests on the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(a)–(b), 110 Stat. 3870, 3874–75 (1996) (codified at 28 U.S.C. § 1491(b)); *see Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 464–65 (2008). The Tucker Act now grants this Court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1).

This Solicitation, as mentioned, was for an order to be issued under an EAGLE basic ordering agreement. *See* FAR § 16.703(d). The parties and Solicitation refer to the order as a "task order." AR 151; Pl.'s MJAR at 1; Def.'s MJAR at 2. Protests involving task orders are broadly excluded from this Court's jurisdiction by the Federal Acquisition Streamlining Act ("FASA"). 10 U.S.C. § 3406(f)(1); *see also* 41 U.S.C. § 4106(f)(1). But orders under basic ordering agreements are not "task orders"

within the meaning of FASA.[4] The FASA task order bar applies to task orders issued pursuant to "task order contracts." *See* 10 U.S.C. §§ 3401(2), 3403, 3406(a)(1). A task order contract is a "contract for services" that provides for service orders instead of "procur[ing] or specify[ing] a firm quantity of services." 10 U.S.C. § 3401(2). But a basic ordering agreement is not a task order contract because it "is not a contract." FAR § 16.703(a); *see also Zoubi v. United States*, 25 Cl. Ct. 581, 583 n.1 (1992) ("The basic ordering agreement … , itself, was not a contract. A contract arose only when the contractor accepted a work order issued by the [agency]."); *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed. Cl. 346, 352–53 (1993) (describing basic ordering agreements as "unambiguous mechanisms for creating … nonbinding price agreements"). Therefore, the Solicitation is not for a task order within the meaning of FASA — even if the parties refer to it as a task order — and remains within this Court's usual jurisdiction over procurement disputes. *See* 28 U.S.C. § 1491(b)(1).

### B. Standing

Red River must also have standing to challenge the contract award. Red River has Article III standing because it claims injuries — among other things, repeated withdrawals of successful-offeror notices — which are traceable to the allegedly defective procurement process and which could be redressed by this Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

A bid protest plaintiff must also be an "interested party." 28 U.S.C. § 1491(b)(1). The "interested party" requirement goes only to "statutory standing," and is therefore not jurisdictional in a strict sense. *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023). Nonetheless, "when the plaintiff is arguing that the [government] made an error in evaluating the bid of another contractor," a

---

[4] Though the parties here do not contest subject matter jurisdiction, I nonetheless have an independent obligation to ascertain the Court's jurisdiction. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (noting that "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press"); *United Int'l Investigative Servs. v. United States*, 26 Cl. Ct. 892, 897 n.1 (1992) ("This court is obligated to determine its own jurisdiction."). This Court has assumed jurisdiction in the past over similar orders without published analysis. *See, e.g.*, *Vanquish Worldwide, LLC v. United States*, 163 Fed. Cl. 57, 60, 68–71 (2022); *VS2, LLC v. United States*, 155 Fed. Cl. 738, 746, 750 (2021); *Gemini Tech Servs., LLC v. United States*, No. 24-1494, 2025 WL 1304206, *4 (Fed. Cl. Apr. 18, 2025). Those decisions are not binding on this Court, though, and "drive-by jurisdictional rulings — asserting or denying jurisdiction without elaboration, or analysis of whether anything turned on the ruling — should be accorded no precedential effect." *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 42 (2025) (quotes and alteration omitted) (quoting *Wilkins v. United States*, 598 U.S. 152, 160 (2023) (itself quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511–12 (2006))).

judicial determination of statutory standing remains "required," although it does not need to be made before reaching the merits. *Id.* at 1152.

The Federal Circuit has developed a two-part test for "interested party," requiring that a plaintiff show it (1) is an "actual or prospective bidder," and (2) "possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed. Cir. 2002) (itself citing *Lujan*, 504 U.S. at 561)). There is no dispute that Red River is an actual bidder. Furthermore, neither the government nor Defendant-Intervenors dispute that Red River has a "direct economic interest." *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). In a pre-award bid protest, because "it is difficult for a prospective bidder/offeror to make the showing of prejudice ... required in post-award bid protest[s]," a direct economic interest exists if the protestor has alleged "a non-trivial competitive injury which can be redressed by judicial relief." *See id.* at 1361–63 (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)). But for the agency errors that Red River alleges, Red River would have maintained its successful status on either or both occasions in which it was named apparent awardee. The Army would also have excluded at least one other offeror from consideration. I find that those constitute a "non-trivial competitive injury." *See Piedmont Propulsion Sys., LLC v. United States*, 167 Fed. Cl. 72, 89 (2023) (citing *Weeks Marine*, 575 F.3d at 1361–62).

### C. Standard of Review

This Court reviews bid protests "pursuant to the standards set forth in section 706 of title 5," *i.e.*, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). That standard requires the Court to consider whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). There are two bases for setting aside government procurements as arbitrary and capricious: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973); *Scheduled Airlines Traffic Offs., Inc., v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996); *Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*, 977 F.2d 1472, 1478 (D.C. Cir. 1992); and *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); *see also Bannum, Inc. v. United*

*States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000).

The first route involves determining "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33 (quotes omitted) (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To succeed in that way, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotes omitted) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). The second route requires "the disappointed bidder [to] show a clear and prejudicial violation of applicable statutes or regulations." *Id.* (quotes omitted) (quoting *Kentron*, 480 F.2d at 1169; and *Latecoere Int'l*, 19 F.3d at 1356).

When resolving motions for judgment on the administrative record under Rule 52.1(c), this Court proceeds "as if it were conducting a trial on the record." *Bannum, Inc.*, 404 F.3d at 1354 (addressing former RCFC 56.1); *see also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012).

## II. Merits

### A. The Gemini Dispute

The first time Red River was named apparent awardee, Gemini argued before the GAO that the Army violated DFARS § 215.306 by failing to conduct discussions with offerors. AR 3955; *see also* Gemini's MJAR at 7–8. The Army agreed with Gemini and opened discussions. AR 5308, 8053. Red River argues that Gemini had forfeited its DFARS § 215.306 claim by failing to raise it early enough in the procurement process, and that the Army therefore erred in taking corrective action in response. Pl.'s MJAR at 27. But the corrective action was neither irrational nor inconsistent with applicable laws. *See Impresa*, 238 F.3d at 1332–33.

Red River does not argue, to be clear, that opening discussions was inherently improper. The text of the Solicitation indicated that while discussions were not expected or intended, AR 195, the Army could elect to conduct discussions if need be. *See* AR 177 ¶ L.1.2 ("The Government reserves the right to conduct discussions in the evaluation process and to permit Offerors to revise proposals, if deemed necessary."); AR 194 ¶ M.2; AR 195 ¶ M.4.4. The relevant regulation provides that for large acquisitions like this one, "contracting officers should conduct discussions." DFARS § 215.306. Nor does Red River argue that the government is forbidden to open discussions after naming an apparent awardee but before the contract is executed. *See* Pl.'s MJAR at 24–27; *see also* AR 194 ¶ M.2 ("The Government reserves the right to: ... conduct discussions at any stage of the evaluation process[.]"). The only question

is whether it was arbitrary and capricious for the Army to open discussions in response to Gemini's GAO protest raising a potentially forfeited claim.

Red River may be correct that Gemini forfeited the DFARS § 215.306 issue. The GAO requires that "[p]rotests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." 4 C.F.R. § 21.2(a); *see COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012). This Court applies a similar rule, requiring offerors to raise "patent" solicitation defects during the bidding process. *See Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1377–78 (Fed. Cir. 2024) ("A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance. Additionally, a defect is patent if it could have been discovered by reasonable and customary care.") (quotes omitted) (quoting *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020)); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313–14 (Fed. Cir. 2007) (citing 4 C.F.R. § 21.2(a)(1)).[5]

But even if the issue was forfeited, it does not follow that the Army violated any law by taking corrective action in response to Gemini's argument. *See Impresa*, 238 F.3d at 1333. The GAO's rule does not purport to preclude either the GAO or the procuring agency from taking action when a technically forfeited argument is substantively meritorious. The GAO retains discretion to consider untimely arguments and grant relief. *See* 4 C.F.R. §§ 21.2(b) ("Protests untimely on their face *may* be dismissed.") (emphasis added), 21.2(c) ("GAO, for good cause shown, or where it determines that a protest raises issues significant to the procurement system, may consider an untimely protest."). And even if the GAO would have rejected Gemini's argument as untimely, that does not mean the Army was compelled to *assert* the defense rather than taking action to improve the procurement. From the procuring agency's perspective, a protestor's failure to timely identify a defect in the solicitation provides a defense — forfeiture — that the agency can choose whether to assert or

---

[5] The parties rely heavily on *Oak Grove*, 116 F.4th at 1377–78, which held — based on *Blue & Gold*, 492 F.3d at 1313 — that an offeror had forfeited a similar DFARS § 215.306 argument by failing to timely raise it before filing suit in this Court. *See, e.g.*, Pl.'s MJAR at 26–27; Def.'s MJAR at 7, 13–14; Pl.'s Reply at 1–4; Def's Reply at 2–4; Gemini's MJAR at 5–7. The relevant preservation and forfeiture rules for this case, though, are those of the GAO, not the *Blue & Gold* standard that applies in this Court. *See Matter of: Crowdergulf, LLC; Drc Emergency Servs., LLC; Phillips & Jordan, Inc.*, B-418693.9 (Mar. 25, 2022) ("[O]ur timeliness rules are different from those at the Court of Federal Claims."); *see also COMINT Sys.*, 700 F.3d at 1383 ("[W]e note that the Government Accountability Office … applies a similar rule, setting various time limits in which protests must be submitted.") (citing 4 C.F.R. § 21.2); *RMGS, Inc. v. United States*, 140 Fed. Cl. 728, 739 (2018). *Oak Grove* is therefore not strictly relevant to this case.

forgo.[6] *See SLS Fed. Servs., LLC v. United States*, 163 Fed. Cl. 596, 601 (2023) ("The agency could have raised the waiver defense at GAO (and then at this court), and, if it had, the protest would be over[.]").

Government discretion makes sense. The point of the federal procurement system is for the government to get the best value in products and services. 48 C.F.R. § 1.102; *see also* FAR § 15.306(d)(2) ("The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation."). When a protestor raises a substantial issue, asserting nonjurisdictional procedural defenses such as forfeiture may not necessarily be in the government's best interest. *See* Tr. at 64. Given a choice between obtaining the best value and notching wins in protest proceedings, agencies should choose the former. At a minimum, this Court should not second-guess agencies' strategic decisions before the GAO any more searchingly than other discretionary acts during procurement.

Given that opening discussions was not in violation of any law, it was not irrational either. *See Impresa*, 238 F.3d at 1332–33. Though the Army had previously chosen not to open discussions because "multiple proposals met the RFP's award scheme," AR 3076, the contracting officer later determined that in light of Gemini's arguments before the GAO, the existence of multiple proposals was not an "adequate rationale for not opening discussions." AR 5308. Although thin, that rationale is reasonable based on DFARS § 215.306 and the contracting officer's obligation to obtain the best value for the government, *see* 48 C.F.R. § 1.102; *see also Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1370–71 (Fed. Cir. 2020) ("We do not require 'perfect explanations,' and 'we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (quoting *In re NuVasive, Inc.*, 842 F.3d 1376, 1382–83 (Fed. Cir. 2016) (itself quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))); *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 382 (2012). The Army's decision to reopen discussions was a permissible exercise of discretion and cannot be set aside.

---

[6] That extends to nonjurisdictional defenses generally. To take the most obvious analogy, the *Blue & Gold* forfeiture rule is nonjurisdictional, *M.R. Pittman Grp., LLC v. United States*, 68 F.4th 1275, 1280 (Fed. Cir. 2023), and therefore within the government's discretion to assert or waive. *See United States v. Hitachi Am., Ltd.*, 172 F.3d 1319, 1334 (Fed. Cir. 1999) (holding an affirmative defense was nonjurisdictional and therefore waivable by the parties); *Eberhart v. United States*, 546 U.S. 12, 19 (2005) ("These claim-processing rules thus assure relief to a party properly raising them, but do not compel the same result if the party forfeits them.").

**B. The Vanquish Dispute**

After Vanquish declined to execute its contract and Red River was named apparent awardee the second time, the Army decided to reopen discussions, then amended the Solicitation. Vanquish was included in those stages of the procurement. Plaintiff argues that the Army erred by allowing Vanquish to compete because Vanquish had become ineligible for further consideration. Pl.'s MJAR at 17–18. Plaintiff also claims that the corrective action was a pretext for benefiting Vanquish. *See* Pl.'s MJAR at 20; Pl.'s Reply at 8–11. I conclude the Army did not act arbitrarily or capriciously.

Plaintiff's protest hinges on Solicitation language stating that "tak[ing] exception" to the rate-capping process "will render the Offeror's proposal unacceptable" and that the proposal "will not be further considered for award." Pl.'s MJAR at 18 n.6 (quoting AR 178 ¶ L.4.1.2); *see also* AR 199 ¶ M.5.3.3(a). According to Plaintiff, once Vanquish declined award over rate-capping, Vanquish was forbidden to participate further.

But even if Red River is right that Vanquish's proposal was "unacceptable" under the Solicitation's terms, that would not be the categorical dead-end that Red River assumes. Although an unacceptable proposal is not eligible for award — and thus cannot be "considered" for award, AR 199 ¶ M.5.3.3(a) — unacceptability is sometimes simply a step to discussions and revisions. *See ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 72 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002) (stating that an offeror's "failure to comply with the Solicitation did not oblige the Army to exclude its proposal, but, instead provided a basis for further discussions and other steps designed to cure the identified defects"); *see also Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 129 (2015), *aff'd*, 657 F. App'x 1018 (Fed. Cir. 2016) (referring to the "well-established principle" that "where, in a negotiated procurement, an offeror's proposal does not comply with the solicitation's requirements, 'an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal'") (quoting *ManTech Telecomms.*, 49 Fed. Cl. at 71); *Galen Med. Assocs., Inc. v. United States*, 74 Fed. Cl. 377, 384 (2006) ("In this negotiated procurement, the [agency] had the obligation to obtain the best value for the government and, to that end, had the discretion to conduct discussions to bring non-conforming offers into the competition.").

Red River likewise argues that discussions should have been limited "only" to "offerors eligible for award who were in the competitive range," which would exclude Vanquish. Pl.'s MJAR at 17; *see* Pl's Reply at 9–11. But Red River's authority states only that discussions "must be conducted … with each offeror within the competitive

range." FAR § 15.306(d)(1); *see also* Pl.'s MJAR at 17. While that language establishes a set of offerors that must be included when discussions take place, Red River gives no reason to interpret it as *excluding* discussions with additional offerors. Red River's interpretation is also in tension with authorities permitting discussions with offerors who submitted technically unacceptable proposals. *See Vanquish Worldwide*, 163 Fed. Cl. at 73–74 ("FAR 15.306(c) governs the formation of the competitive range prior to conducting discussions and does not prohibit the government from engaging in discussions with technically unacceptable offerors[.]"); *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 318 (2022) ("[T]he government has the discretion to include even technically unacceptable proposals in the competitive range."). Thus, the applicable regulations do not prevent the Army from allowing Vanquish to participate in discussions after it rejected an award.

For similar reasons, Red River is mistaken that the Army erred by issuing Amendment 6 to Vanquish. Red River's authorities state that "[a]mendments issued after the established time and date for receipt of proposals shall be issued *to all offerors that have not been eliminated* from the competition." FAR § 15.206(c) (emphasis added); *see also Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 18, *on reconsideration in part*, 161 Fed. Cl. 100 (2022) ("[T]he government need *only* provide the amendment to those offerors remaining in the competition[.]") (emphasis added). But as with FAR § 15.306, that language establishes a group of offerors who must receive amendments without limiting the contracting officer's discretion to include others.

That leaves Red River's argument that discussions and Amendment 6 were intended to benefit Vanquish alone. *See* Pl.'s MJAR at 20; Pl.'s Reply at 8–9. The government concedes that making a change in bad faith to steer award to a given offeror would be arbitrary and capricious. Tr. at 72–73; *see BAE Sys. Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217, 237–39 (2022) (describing the standard of proof required to show bad faith); *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 25 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) (same). But this Court cannot find such intent without clear and convincing evidence amounting to "well-nigh irrefragable proof." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002); *see also Square One Armoring Serv. v. United States*, 123 Fed. Cl. 309, 329 (2015); *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 226 n.12 (2005), *aff'd*, 163 F. App'x 892 (Fed. Cir. 2006). The evidence here does not rise to that level.

Most obviously — as Red River conceded at argument — the decision to reopen discussions and issue Amendment 6 benefitted not just Vanquish, but Gemini. Tr. at 11. Both Vanquish and Gemini got another chance to compete for the order award.

While it is conceivable that a protestor could find evidence that agency action that seems to benefit two offerors was in fact intended to benefit only one, Red River has not done so here. *See EP Prods.*, 63 Fed. Cl. at 226 n.12.

The government, in contrast, brought considerable evidence that capping indirect rates had complicated many procurements and was ripe for reconsideration. More than one contractor other than Vanquish had complained about the capping requirement. *See* AR 6924, 6927. In other procurements, capping rates had led one offeror to decline an award in November 2022, another to request an equitable adjustment in January 2023, and a third to submit a notification of work stoppage in June 2024. AR 8086.

Following those events, an Army senior contracting official ordered the government to cease capping rates. AR 8087. An email with directions specific to current EAGLE orders followed on July 26, 2024. AR 6929–30. The email specifically directed the Fort Campbell Solicitation to reopen discussions so that offerors in the competitive range could provide further supporting documentation for their Cost/Price proposals "in order to eliminate the necessity for capped rates." AR 6930. The policy change was formalized in a memorandum on August 19, 2024, stating that "all EAGLE Task Orders shall be awarded to the successful Offeror(s) without the capping of indirect rates," and that future solicitations would remove the relevant rate capping language entirely. AR 6985, 8158. This memo explained that "the capping of indirect rates ... has significantly put Small Businesses at risk of performing services by not allowing them to adjust rates based upon the economy. Therefore, the Government has taken action to remove the cap in an effort of good faith[.]" AR 6985.

According to Red River, the fact that the Army's communications did not contemplate an amendment — only additional discussions — implies that Amendment 6 was made solely to benefit Vanquish. Pl.'s MJAR at 19–20; *see* AR 6930 (laying out the Army's communications). It is hard to see how that follows: The Army reopened discussions as directed, then exercised its discretion to amend the Solicitation to reflect the new policy. That does not resemble the typical case of an agency acting to benefit a given offeror. *See BAE Sys. Norfolk*, 163 Fed. Cl. at 238 ("The increase in competition is what makes Plaintiff's pretext argument different from the typical case in which a protestor alleges pretext or bad faith. Normally, if an agency acts in a manner that is pretextual, it is attempting to avoid competition."). The decision to amend is certainly not the clear and convincing evidence of bad faith that Red River needs to prevail. *See ManTech Telecomms.*, 49 Fed. Cl. at 73 ("[T]he contracting agency has broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair and impartial competition and to permit

the government to obtain its minimum requirements at the most favorable price."); *see also Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 219–20 (2011) (explaining that where the agency's decision to amend the solicitation was rational, the presumption of good faith could only be overcome with clear and convincing evidence).

In short, the record shows that the Army's decision to remove capping had a number of causes other than Vanquish's objection and seems to have been to the advantage of other offerors. Thus, Plaintiff has failed to provide the clear and convincing evidence necessary to overcome the presumption of the government's good faith.

### C. Inequality of Discussions

Next, Red River complains that the procurement process was tainted by the Army's failure "to conduct equal and meaningful discussions[.]" Pl.'s MJAR at 20–23. Red River has shown no error. Even if there was error, it was harmless after Amendment 6 issued.

First, Red River argues that "the Army has only held discussions with Gemini and Vanquish about their indirect rates, and not with Red River[.]" Pl.'s MJAR at 21; *compare* AR 8352–54, 8356–57 (communications with Gemini and Vanquish), *with* AR 8355 (communications with Red River). But the Army was not obligated to conduct the same discussions with each offeror — only to conduct discussions fairly and equally. *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 438 (2016) ("[A]lthough preferential treatment is impermissible, the government is 'not required to conduct identical discussions with each offeror.'") (quoting *DMS All–Star Joint Venture v. United States*, 90 Fed. Cl. 653, 672 (2010) (itself citing *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 735 (2008))). Here, discussions focused on Gemini's and Vanquish's support for their proposed indirect rates. AR 8353–54, 8357. The Army had already determined, though, that Red River *had* supported its rates. AR 6871. Fairness and equity did not compel the Army to hold discussions with Red River when there was nothing to discuss. *Active Network, LLC v. United States*, 130 Fed. Cl. 421, 434 (2017) ("[T]he contracting officer must discuss deficiencies or significant weaknesses … *to which the offeror has not yet had an opportunity to respond*. Agencies are not required to have identical discussions with all offerors and the scope of those discussions are a matter of [the contracting officer's] judgment.") (emphasis added, quotes and alterations omitted) (quoting FAR § 15.306(d)(3) and citing *Atl. Diving Supply, Inc. v. United States*, 107 Fed. Cl. 244, 263–64 (2012)); *see, e.g.*, *DynCorp Int'l LLC v. United States*, 148 Fed. Cl. 568, 578 (2020), *aff'd*, 10 F.4th 1300 (Fed. Cir. 2021) ("As the Agency never determined that DynCorp's prices were too high, and as

DynCorp's proposal did not contain any specific flaws that would trigger discussions, the Agency was not required to hold discussions.").

Second, Red River alleges that after the Army revoked its second offer of award and initiated discussions, Red River submitted questions about the policy reversal on the capping of indirect rates and did not receive "timely" responses, despite the government responding to Gemini's questions "the very same day." Pl.'s MJAR at 12; *see also* Tr. at 47. The record does not make the exact timeline obvious. Plaintiff notes that the name of the file answering Gemini's questions refers to the date August 18, 2024. Tr. at 106; AR 8277–78 (file name entitled "Gemini Tech Svcs Discussion Qs&As 08182024"). But it is not clear whether that is the date the questions were received or the date the answers were sent. An email sent to Gemini on September 4 attached a file entitled "Gemini Tech Services_Discussions questions_Aug_18_24_Responses." AR 8289. Red River, as it happens, seems to have received a file of responses on the same day. *See* AR 8159 (attaching a file entitled "RRST_Campbell_Questions_Ref Reopening Discussions v.3_Response). The record does not demonstrate that the Army in fact responded to Red River and Gemini on different timelines.

In any event, the allegedly unequal discussions took place before Amendment 6 issued. Though offerors would still be required under Amendment 6 to support their proposed indirect rates, the Army had already determined that [. . .]. AR 6871. The discussions concerned the capping of indirect rates, and because the capping requirement was removed by Amendment 6, the discussions no longer matter to the award decision. That makes any error harmless. *Barbaricum LLC v. United States*, 172 Fed. Cl. 186, 200 (2024) (explaining that harmless errors are "those that would not have substantially changed the unsuccessful offeror's chance of receiving a contract") (citing *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed. Cir. 1996); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 960 (Fed. Cir. 1993); and *Bannum, Inc.*, 404 F.3d at 1358).

### D. The Debriefing Issue

Finally, Red River argues that the Army failed to provide the required post-award debriefing when it declined to provide Plaintiff its requested original SSDD. Pl.'s MJAR at 29. But the Army did not violate the relevant regulations, and any error was harmless.

A procuring agency must debrief an offeror and "furnish[] the basis for the selection decision" when the offeror submits a written request *within three days* after receiving notification of a contract award. FAR § 15.506(a)(1); *see* Pl.'s MJAR at 27. However, Plaintiff did not submit written requests until April and July 2024 — long

after it was named the first apparent awardee in November 2023. AR 7540, 7683, 7821. The Army declined both requests as untimely, consistent with FAR § 15.506(a)(1). AR 6843, 7683.

Regardless, the Army ultimately provided Plaintiff with the SSDD Addendum. AR 7651–59; Pl.'s MJAR at 28–29. That document duplicated the technical analysis contained in the original SSDD, *compare* AR 3074 *with* AR 6838, so in that respect the substance of the original SSDD is now available to Red River.

To the extent the SSDD Addendum omits information that was in the original SSDD, it no longer matters. The original SSDD and price analysis from November 2023 included [. . .]. *See* AR 199 ¶ M.5.3.2.1. But that [. . .] was removed from the cost realism analysis in May 2024 and did not form the basis of the second award decision (to Vanquish and then Plaintiff). *See* Pl.'s Reply at 12; *compare* AR 3077 *with* AR 6871. Even if the SSDD Addendum omitted information relevant to rate capping, *see* Pl.'s Reply at 12, Red River has not explained why that matters after Amendment 6. Thus, Red River seems to have slept on its rights, but eventually got the substance of what it wanted.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record (ECF 40) is **DENIED** and Defendant's (ECF 44) and Gemini's (ECF 42) motions are **GRANTED**. Red River's motion for leave to file new authority (ECF 58) is **GRANTED**.

Pursuant to the Court's December 18, 2024, Protective Order (ECF 13), this Opinion has been issued under seal. The transcript of the April 2, 2025 hearing is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **June 12, 2025**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

                                              s/ Stephen S. Schwartz
                                              STEPHEN S. SCHWARTZ
                                              Judge